**UNITED STATES of America,
Plaintiff,**

v.

**29.28 ACRES OF LAND, SITUATE IN the TOWNSHIP OF WAYNE, PASSAIC COUNTY, NEW JERSEY, and the Circle Lumber Company et al., Defendants.**

Civ. No. 801–54.

United States District Court
D. New Jersey.

May 22, 1958.

Chester A. Weidenburner, U. S. Atty., by Charles H. Hoens, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Stoffer & Jacobs, by Joseph M. Jacobs, Newark, N. J., for defendant Circle Building Supply Co., Inc., Joseph Harrison, Newark, N. J., of counsel.

Emory, Langan, Lamb & Blake, by Paul B. Thompson, Jersey City, N. J., for defendant Estate of Harry L. Tether.

Mr. Peter Paul Kaminski, pro se.

HARTSHORNE, District Judge.

In this condemnation proceeding the Government has taken, for a Nike missile site, a number of tracts owned by a number of parties. Some of these tracts have been taken in fee, some for easements of way,[1] some for a safety area easement,[2] some for a line of sight easement,[3] some for a pipe line,[4] and some for a combination of the above. Not only so, but the Government has had three tak-

[1] " * * * a perpetual and assignable easement and a right of way for a road, telephone and electric power line and cable, water lines, and sewer lines in, on, over, under, and across said tract for the construction, maintenance, repair, operation, and patrol of such facilities, together with the right to trim, cut, fell, and remove therefrom all trees, underbrush, and obstructions, and any other vegetation, structures, or obstacles within the limits of the right of way, subject to existing easements for public roads and highways, public utilities, railroads, and pipe lines; reserving to the owners, their heirs, executors, administrators, and assigns the right of ingress and egress in, over, and across said land in common with the United States of America and its assigns."

[2] " * * * a perpetual and assignable easement for a safety area consisting of the right to prohibit human habitation; the right to remove buildings presently or hereafter being used for human habitation; the right to prohibit gatherings of more than twenty-five (25) persons; the right to post signs indicating the nature and extent of the Government's control; and the right of ingress and egress over and across the said tracts for the purpose of exercising the rights set forth herein; Reserving, However, to the landowner, all right, title, interest and privilege as may be used and enjoyed without interfering with or abridging the rights hereby taken for said public use."

[3] " * * * a perpetual and assignable easement for a Line-of-Sight consisting of the following rights over the hereinafter described Line-of-Sight clearance surface. (1) The continuing perpetual right to cut to ground level and remove trees, shrubs, bushes, or any other perennial growth or undergrowth infringing upon or extending into or above the sight clearance surfaces hereinafter described; (2) The right to remove, raze, or destroy those portions of buildings, other structures, and land infringing upon or extending into or above the sight clearance surfaces hereinafter described; and (3) The right to prohibit the future construction of buildings or other structures infringing upon or extending into or above the sight clearance surface hereinafter described; Reserving, however,

ings at different times, the first, October 14, 1954, the second August 22, 1955, the last March 14, 1957, which affected only the small Saniewski properties. The fact that these takings were at different times is of real importance, because all these properties are in a locale, the nature of which was rapidly changing, both before and during the time between the first two takings. Again, because of this changing situation, the municipality in which the tracts lie—Wayne Township—had been induced, both by this very change and by the activity of property owners, to make changes in its zonings, which to some extent may have affected these properties during the very periods with which we are concerned. Each of these different factors substantially affects the amount of the loss to the various property owners from these two governmental takings. Doubtless because of the above complications, a jury was waived, the trial being to the Court and lasting some two weeks. The Court, with counsel, personally inspected the properties involved before the hearing, since one's eyes can often see, and interpret, what it would take volumes to attempt to put into words.

Generally speaking, until a few years before the taking, the neighborhood had been completely rural and agricultural. Then the State put through Route 23, a broad dual concrete highway, one of the main routes in the entire State. Of course, it took some time for the full effect of this improvement to be appreciated locally. One of the first to appreciate it was the Circle Building Supply Co. Inc., which owns the land mainly involved in this case, largely because of its interest in the building business. This company bought considerable acreage, by two purchases at different times —Tract 1, October 24, 1950; Tract 2, April 15, 1953. The entire tract purchased was then farm land on the east side of the above north and south highway. It ran from the bottom of a hill, halfway up its side, including a considerable amount of low land at its easterly end. This land is substantially surrounded on all but the road side with the property of one Tether, a farmer, certain of whose property is also involved here, the smaller parcels of the other interested owners—Kaminski, Saniewski and Acker—lying close by.

Circle built a lumber and building material supply store on the road, after making considerable fill, and blacktopping this fill, in front of the store, with a road entrance going along its southerly side and a road exit along its northerly side. In the rear of the store for some distance Circle created a lumber yard, with some sheds. The remainder of the Circle properties here involved was vacant land, some on the hillside, some on the low flat, most of it previously having been farmed. Such was the situation as

to the landowners, their heirs, executors, administrators, successors and assigns all right, title, interest, and privilege as may be exercised and enjoyed without interference with or abridgement of the easement and rights hereby taken for said public uses. The line-of-sight clearance surface is a triangular plane surface connecting the Battery Control Site and the Battery Launching Site. The vertex of the triangular plane is located on the Missile Tracking Radar on the Battery Control Site at a point 49 feet above elevation 488.5 feet mean sea level. The base of the triangular plane is a line 805 feet long located 25 feet above ground on the side of the Battery Launching Site which faces the Battery Control Site. The horizontal length of the Line-of-Sight clearance surface is 9.800 feet."

4. "* * * a perpetual and assignable easement and right of way for a water line in, on, over, under, and across said tract for the construction, maintenance, repair, operation, and patrol of such facilities, together with the right to trim, cut, fell, and remove therefrom all trees, underbrush, and obstructions, and any other vegetation, structures, or obstacles within the limits of the right of way, subject to existing easements for public roads and highways, public utilities, railroads, and pipe lines; reserving to the owners, their heirs, executors, administrators and assigns the right of ingress and egress in, over, and across said land in common with the United States of America and its assigns."

it substantially existed at the time of the first taking.

After the two Circle purchases, but previous to the first taking, the public began to appreciate the difference in values created by the new highway. All agree that there was a big improvement in changing this locale from a rural to a semi-suburban area, with selected industries, from shortly before this first taking on through the second taking and, in fact, thereafter. That this change was substantial may be gathered from the facts that in the last 14 years the property values in this township have trebled in value, while the population has doubled in the last seven years alone. Perhaps it should be added that a summer community had existed, even previous to putting through Route 23, around Packanack Lake, a mile or so to the east of the takings. This community naturally grew concomitantly changing in fact, after the new highway was constructed, to an all year round community, with all necessary facilities.

There is no doubt that much of the difference of opinion between the landowners and the Government, as to the damage ensuing to the owners from these two takings, is due not only to some of the unusual factors above alluded to, but particularly to the different viewpoint as to the varying extent of this rapid change over the entire neighborhood preceding, and intervening, these takings, with its probable sequelae, such as a great increase in the use of the land as a suburban residential community, with all the necessary facilities, such as streets, water, sewers, etc.

In view of the many owners and the many tracts involved, and of the fact that there were two takings, it will help clarify this determination of the many issues, if the tracts are taken up separately, according to the individual owners; and as to each owner, according to the separate tracts, as in turn affected by the separate takings. Indeed, to place these facts in tabular form will much shorten the discussion, though certain applicable principles of law will require discussion. Upon the basis of this discussion of the principles of law and the tabular presentation of the facts involved, this Court will then assess the damages of the landowners, upon whom, of course, lies the burden of proof.

■ The constitutional right of the landowner to a just compensation for his lands taken, U. S. Const. Amendment V, in eminent domain cases, ordinarily means fair market value, United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. This means the market value of the land as between a willing buyer and a willing seller. Since a willing buyer and a willing seller are each seeking to profit from future developments and these developments are not certainties, but mere probabilities, if not possibilities, clearly, while such estimate of market value must be based in general upon facts having a rational foundation, the determination of such probabilities involves some speculative factors. Westchester County Park Commission v. U. S., 2 Cir., 1944, 143 F.2d 688, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583. Indeed, in the absence of adequate proof of sales of truly comparable properties, this determination of fair market value often becomes somewhat of an "educated guess." Westchester County Park Commission v. U. S., supra, 143 F.2d at page 692; United States v. 50.08 Acres of Land, D.C.E.D.N.Y.1957, 149 F.Supp. 749, 751. Of course this fair market value must be determined as of the date, or dates, of the taking of possession by the Government.

"Just compensation in a proceeding of this kind represents the difference between the fair market value of the entire unit of property of an owner at the time of the taking and the fair market value of the part remaining after the taking." United States v. Waymire, 10 Cir., 1953, 202 F.2d 550, 554.

This just compensation consists of two major elements, first, the loss to the owner of the land, or rights, actually taken, and second, the loss to the owner from the

effect of such taking on the property remaining in his hands after the taking, normally called "severance damage." United States v. Miller, supra, 317 U.S. at page 376, 63 S.Ct. at page 281.

In the light of these principles, we turn to the further facts bearing upon the loss to the landowners respectively.

Circle Building Supply Co. Inc.

At the time of the first taking, Circle was operating a lumber and building supply store and yard on the east side of Route 23, from about the foot of the hill halfway up its side, together with its ownership of a considerable tract of land to its east and north. It took title to Tract 1, consisting of slightly over three acres, for this lumber and building material supply purpose, on January 4, 1951. This tract had a frontage of slightly less than 200 feet on the highway and extended, irregularly, to the rear some 700 feet. On April 15, 1953, it contracted to purchase Tract 2, adjoining Tract 1 on the north. Tract 2 consisted of some 33½ acres, with a highway frontage of 462 feet and a rearage of almost 2,000 feet. This tract was acquired for future development for residential purposes. Circle, being in the lumber business, was doubtless more aware of this probable future development than were the farmers and other landowners thereabouts. After purchasing the first tract, Circle obtained a variance to permit the use of the westerly portion of Tract 1 to a depth of 200 feet for its business. Thereupon it put considerable fill on the very front portion of this first tract and blacktopped it, constructing a substantial store, with certain outbuildings, including lumber sheds. Tract 2, generally purchased for residential development, on the easterly side of the highway, was in part at the level of the road, in part above the highway, and in part below it. A considerable portion of its rearage sloped down to the east, further than the grade of the frontage of Tract 1, so that this rearage had been ditched to carry off flood waters even while used for agricultural purposes,

though this flooding was not deep and only of occasional occurrence.

Since much of the front portion of Tract 2 was above the level of the road and relatively free of stone, Circle had arranged with third parties for removal of much of this earth for fill at a fixed price per cubic yard, and had also arranged for the removal of topsoil at another price. In addition, consideration must be given to the need of fill in the low rearage of this same tract, and that for that reason, if no other, the removal of this fill and topsoil might not continue indefinitely under the contract. Such being the case, while it is clear that the existence of this fill and topsoil under its general contract was an element to be considered, with all the other elements, in ascertaining the fair value of this tract, Circle's possible profit from this contract of removal cannot be ascertained as a separate value factor, to be added as a fixed amount, to the valuation of the tract itself. Thus the situation here differs substantially from that of lands whose prime value is their gold, their silver, their lumber, for which there is a ready market, with a fixed contract in effect for its removal. Cf. Georgia Kaolin Co. v. U. S., 5 Cir., 1954, 214 F.2d 284, and National Brick Co. v. U. S., 1942, 76 U.S.App.D.C. 329, 131 F.2d 30. To the extent that the owner's experts considered this fill contract as giving the owner a definite profit, to which sum the fair market value of the land, in its then state, should be superadded, the basis of their valuation would seem incorrect.

Another factor bearing upon the method used by the Government experts on the one hand, and the owner's experts on the other, as to Tract 2, must also be considered. Since this tract was in the main intended for residential purposes, and suburban residences ordinarily require piped water and sewers, the availability of such water facilities to this tract was given great weight by the two sets of experts. The facts of the matter were that Circle, at the time of the first taking, had no legal right to insist that water be made available to this second

tract. To get it Circle would have had to make arrangements with Tether, whose land practically surrounded Circle, save along the road, and with Packanack Utilities Company, which supplied the Packanack community with water and sewage facilities. Thus the Government experts valued this Circle land as if it had no piped water and sewage facilities available. Obviously, for residential purposes any such absolute lack made it relatively undesirable, and so they gave this land but relatively small value. On the other hand, since Tether had always been on friendly relations with Circle, and since Circle held a letter from the company supplying the Packanack community with water, indicating its willingness to supply the Circle tract in question with this water as soon as conditions permitted, the experts for Circle valued this tract upon the assumption that piped water was actually available for this potential residential property. They therefore gave it a relatively high value.

■■ In point of fact and law, all these experts were in error. The fact is that the above favorable situation with Tether, the owner of the intervening land, and with the water company, plus the general growth of the immediately surrounding territory as an up-to-date suburban residential community, in all probability meant that the tract in question would soon have had piped water and sewers available to it for up-to-date residential purposes. That this probability, not the exact situation at the time of the taking, is the criterion to be considered by these experts in their valuations, is clear. After all, as shown above, fair market value is the criterion, and this fair market value is based upon the probabilities as they appear to the willing buyer and the willing seller. This principle has recently been applied analogously to probable zoning changes, as indeed it should be to all such situations. United States v. 50.08 Acres of Land, supra.

With these general facts and principles in mind, we turn to the tabular statement of the Circle tracts involved, as affected, first, by the first taking, October 14, 1954, and thereafter by the second taking, August 22, 1955.

Table I

First Taking

Tract 1

(a) A 100E–1 access road

(b) A 100–6 access road

(c) Severance damages therefrom

Tract 2

(d) A 100   12.59 acres—fee

(e) Severance damages therefrom

———◆———

In addition to the facts above stated, bearing upon the above takings, it should also be noted that the taking of the Government of an easement of way, in items (a) and (b) above, did not exclude the owner from the similar use of such lands. Thus, while there was some crowding of Circle's business activities as a result of the first taking, resulting in turn in some limitation of its use of these rights of way, nevertheless, it still had the general use of such rights of way. Thus these takings by the Government of items (a) and (b) above should not be considered equivalent to a taking by the Government of their full fee, but only equivalent to a taking by the Government of half the fee of such lands, as admitted by the Government experts.

As to the taking by the Government in fee of more than 12 acres of A 100, item

(d) above, this land was worth much or little, depending upon whether or not piped water and sewage facilities would probably be available for use of this growing, up-to-date suburban community. Here we have noted that the Government experts were in error in basing their valuations upon the nonavailability of such important facilities. This made them value this land as a distinctly second-class residential area. While, on the other hand, this tract did not have water legally avaliable at the exact time of the first taking, in all probability these important facilities would have become available in the near future, so that the valuations placed on this tract by the owner's experts would seem largely supportable.

As to the severance damages, item (c) above, it is worthy of note that the valuation of the Government's experts in this regard is substantially greater than that of the owner's. As to severance damage to the remainder of Tract 2, (e) above, this, like that taken, is potential residential land, which becomes landlocked by this first taking. Its market value, similar to that of its frontage, which was actually taken, is affected greatly by the probable availability to it in the future of water and sewage facilities. This has an indirect effect on the amount of its severance damage.

### Table II

#### Second Taking

| Tract 1 | Tract 2 |
|---|---|
| (a) A 100E–2 safety area easement | (c) A 100 E–3  1.30 acres safety area easement |
| (b) Severance damages | (d) Remainder of A 100 taken in fee  17 acres |

Both as to item (a) and as to the other actual takings—from Tract 2—it is important to remember that between the time of the first taking and the time of the second taking there was great increase in value of that entire neighborhood, due to the increased appreciation by the public of its advantages as a suburban community, attractive in its physical situation, and with excellent transportation facilities of all kinds to metropolitan New York. However, since the part of this area in Tract 1 was in the immediate rear of a lumber yard, it was not appropriate for residential purposes but only for use in conjunction with the lumber yard. This use was still permissible, despite the taking by the Government of the safety area easement. Thus the loss of value of the rearage land so taken is not very great, and its severance damage is negligible.

As to (c) above, this was zoned for residential purposes only, which was its highest and best use, being in the neighborhood of Route 23. It had experienced the great increase in property values above noted, with water and sewage facilities probably available shortly. Since the taking by the Government prohibited the gathering of 25 or more people, or human habitation, thereon, its use for residential purposes was essentially nullified. The taking was thus equivalent to that of a fee of this valuable residential property.

To item (d) above applies the data above stated as to the first taking of the portion of the tract in A 100, save for the fact that this second taking is a taking of landlocked land in its rear, some of it low. For that reason, this land, as rearage, cannot be given the same value as its frontage, as well as the fact that this

rearage is subject to occasional flooding in its most easterly area.

■ In addition to all the above factors bearing upon the proper valuation of the properties involved and the losses to the owner, both direct and severance, arising from their taking, we must bear in mind the difficulties in valuation which the experts on both sides themselves faced in finding comparable sales as a basis for their tendered valuations. Such sales, to be comparable, must be comparable in both time and character. The time element is here of particular importance due to the rapid change in the nature of the neighborhood from farm land to suburban residential property with appropriate business. In addition, the characteristics of these other sales must be really similar, in order to be comparable. In rural surroundings, such as these tracts were originally, where tracts, not lots, are ordinarily dealt in, fewer sales occur than in cities. Furthermore, as the edge of suburban growth encroaches on rural land, properties similar in their physical characteristics have widely different values, depending upon their being within or without this growth, and their distance from its edge. All these facts rendered it difficult for the experts to find sales which would have been deemed comparable to the subject properties, were such properties to have existed in a settled suburb or city. But because no better comparables existed, and such comparables were generally helpful as a basis, this Court permitted reference to a series of sales, some of which at least would have been deemed incomparable to the properties in question, had a substantial number of more comparable sales been available, as they probably would have been in a settled suburb or city. However, the comparables alluded to by the experts, broadly admitted in evidence for the above reason, were in practically every instance dissimilar, in one respect or another, from the property in question. Thus in practically every case the experts, in alluding to them, had to admit such differences, then proceed to discount these differences, and thereafter to apply such sales, subject to such discounts—or additions, as the case might be—in fixing their valuation of the properties taken by the Government and of the property remaining in the owner thereafter.

But because of the above differentiations, this opinion would approach the encyclopedic, were the bearing of such comparables on the valuations of the properties taken to be discussed in detail, with regard to each of these properties, as they were respectively subjected to the two different takings.

In addition, the experts differed among themselves as to the proper method to use in analyzing the values to be placed both upon these comparables and upon the properties taken. The Government experts insisted that when dealing with property fronting on a highway, in either urban or suburban territory, the proper method of valuation was to value the frontage by the front foot, and then to value the rearage, according to depth charts, as acreage, in tables prepared by recognized real estate associations. The owner, on the other hand, had valued most of the Circle properties on the straight acreage basis. This they insisted was correct because, save for a right of way which ran into Route 23, none of the Circle properties taken actually abutted upon a highway or came within many feet of it. But, in any event, this difference in method of valuation by these experts somewhat handicaps this Court in arriving at a just valuation. In addition, when Circle, dealing in lumber used in building houses, purchased its properties, it doubtless anticipated that suburban development was probably coming, even though it had not yet arrived. But its purchase was from an owner of farm land, who doubtless was not so well informed as to the probable future.

Finally, in approaching this matter of valuation, which involves equally the two factors of the value of the land actually taken and the damage to the land remaining in the owner—severance dam-

age—it will be of aid if the "just compensation" which is to be determined shall be considered simply as "the difference between the fair market value of the entire unit of property of an owner at the time of the taking and the fair market value of the part remaining after the taking." United States v. Waymire, supra [202 F.2d 554]. With this in mind, we set forth the contentions of both sides as to these valuations and the conclusion of the Court thereon, as it applies to each of the two takings, and to each of the two tracts purchased by Circle, thus including severance damages in this determination of such "just compensation." For clarity, and because, in dealing with such probabilities, meticulous accuracy is impossible, round figures only are used.

### Table III

### Circle Valuations and Damages

#### A. First Taking

#### Tract 1

| | Government | Owner | Court Valuations | Damages |
|---|---|---|---|---|
| Before First Taking | $55,912 – 59,721 | $60,040– 63,385 | $60,000 | |
| After First Taking | 41,717 – 45,389 | 46,037– 52,255 | 46,000 | |
| Damages First Taking | 14,195 – 14,332 | 11,130– 14,003 | | $14,000 |

#### Tract 2

| | Government | Owner | Court Valuations | Damages |
|---|---|---|---|---|
| Before First Taking | 27,059– 48,607 | 104,005– 111,740 | 71,500 | |
| After First Taking | 9,192– 31,450 | 15,991– 18,851 | 20,000 | |
| Damages First Taking | 17,157– 17,867 | 85,154– 95,749 | | $51,500 [5] |

5. The Court will set forth hereunder, in Table IV, the method it used to arrive at its valuations and damages, as set forth in Table II supra, from the first taking of Tract A 100 of 12.59 acres taken in fee this taking being by far the most important of all the governmental takings, from which the greatest amount of damages arises, and as to which the viewpoints of the experts on each side most widely differ. Since Table III sets forth the valuation and damage figures as contended for by the Government and the owner, it will be unnecessary to repeat the unitary and other bases therefor, differing both in amount and in method as they do, as set forth in the evidence and the briefs of the parties. The Court will only set forth its own similar valuations and determination of damages, as based upon its findings in that regard under the evidence, insofar as this outstanding tract A 100 is concerned, on the first taking. It is to be understood that only round figures are being used. This, of course, accounts for any slight mathematical discrepancies.

## B. Second Taking

### Tract 1

|  |  |  |  |  |
|---|---|---|---|---|
| Before Second Taking | 46,757– 55,110 | 52,493– 56,412 | 51,500 |  |
| After Second Taking | 45,720– 54,069 | 47,841– 54,012 | 50,000 |  |
| Damages Second Taking | 1,037– 1,041 | 2,400– 4,652 |  | 1,500 |

### Tract 2

|  |  |  |  |  |
|---|---|---|---|---|
| Before Second Taking | 38,373– 46,285 | 33,868– 36,404 | 37,000 |  |
| After Second Taking | 28,158– 34,650 | 21,660 | 25,000 |  |
| Damages Second Taking | 10,215– 11,635 | 12,208– 14,744 |  | 12,000 |
|  |  |  | Total | $79,000 |

---

## Table IV

### First Taking A 100

| | | Damages |
|---|---|---|
| Before First Taking: | | |
| (a) Approximately 20 acres, at $3,225 an acre (near frontage) | $64,500 | |
| (b) Approximately 14 acres, at $500 an acre (low rear land) | 7,000 | $71,500 |
| Remaining After First Taking: | | |
| (a) Approximately 3.5 acres, at $3,225 an acre | 11,300 | |
| (b) Approximately 4 acres, at $1,300 an acre (high land, rear) | 5,200 | |
| (c) Approximately 14 acres, at $250 an acre (low land, rear) | 3,500 | 20,000 |
| | | $51,500 |

In each instance in the above valuations, note that the lowest amounts are stated first.

In the above, it will be noted that the valuations by the experts on each side vary widely only insofar as the first taking of the second Circle tract is concerned, this tract being solely a taking of the fee of a relatively large acreage. Turning then to the fee taking of this large acreage, we note there are real reasons for this disparity. In the first place, this property when purchased by the owner was bought as acreage farm property. But it was taken from the owner after the substantial change was well under way to a suburban community, with a huge shopping center definitely planned in its immediate neighborhood. Thus, when the property was bought, the fact that piped water and sewage might well become available was of small concern to the one who sold it as farm land. But when it was taken by the Government, the probable availability of piped water and sewage was of the greatest concern to Circle, from whom it was taken. Unfortunately, the Government experts admitted they valued this land as if no such water and sewage was available, and added that, had they considered it to be available, their valuations would have been much greater than they were, as set forth in the above table. That they should have considered the real probability that such water and sewage would shortly become available is clear. Not only so, but the change in character of the neighborhood, with this shopping center definitely planned, was far beyond that ordinarily occurring in such a relatively brief time. These two factors alone indicate that the valuation given by the Government experts to this land is definitely too small. The net result of these two takings, of varied kinds at different times, of the different Circle tracts, shows that just compensation to Circle therefor is in the amount of $79,000, such being the determination of this Court.

Tether

Generally speaking, all the Tether lands surrounded the Circle lands on all sides but that of the highway to the west. All were used solely as farm lands until just before the time of the taking of certain Tether tracts, when Tether discontinued their use entirely, primarily for personal reasons.

Of the tracts taken, the only one taken in fee was A 101, taken October 14, 1954. It consisted of 1.8 acres, which lay almost directly to the rear of the Circle lumber yard and driveways, and southeast of the major Circle taking of A 100. This land was distant from all road access and thus its severance effect upon other Tether lands was negligible. It might be added that the comparables, used by the respective experts as a basis for their estimations of its value, differed in so many respects from A 101 that most of them were almost incomparable, as above alluded to.

The owner's valuation of the tract was, as residence property, $700 per acre. The Government, on the other hand, valued the tract as farm land, at from $300 to $500 per acre. With the tract's location in the immediate rear of a lumber yard, and almost inaccessible to all convenient road exits, its value for residential purposes would be slight indeed, though its possible future use in that regard cannot be entirely disregarded. The fair value of this taking, all factors considered, would seem to be $1,050.

At the second taking, August 22, 1955, other Tether tracts were taken. The first was of tract A 101E–1, consisting of 8.7 acres, this being not a taking in fee but one of two easements, the first, a safety easement, the second, a ditching easement. The owner contended that this taking constituted the taking of the equivalent of a fee, since he claimed it should be treated as residential property, for which it could no longer be used because of the safety easement. His valuation of the fee was similar to his valuation contention as to A 101, i. e., $700 per acre. The Government, on the other

hand, contended that it should be considered as farm land, for which it still could be used, subject to such easements, and that, therefore, its loss was from $250 to $300 per acre. This land, in fact, was low, requiring substantial fill to make it really useable for residential purposes. It, too, was relatively inaccessible, so that severance damage was negligible. It, therefore, cannot be considered as desirable residential property, even though, subject to the above disadvantages, it might possibly have become useable therefor in the future. That it did have a residual value, even after the taking, is established by its later sale as a playground to the Packanack community. The fair value of its taking is fixed at $3,100.

The most valuable of the Tether tracts taken, per acre, was A 101E–2, consisting of three acres north of the above major Circle taking, on relatively high, though sloping, ground. This taking was of both a line of sight easement and a safety easement, the latter making it unuseable for residential purposes. Clearly, residence purposes was its highest and best use.

The Government's experts valued this particular land as being worth $800 an acre before the taking, while the owner gave it a then value of $700 an acre. It must be remembered that this latter was an over-all acreage value, including the value of Tether's relatively low lands as well. The Government's valuation of $800 for this particularly high land, abutting on a paper street, seems fair. Since it could no longer be used for residential purposes after its taking, but only for a means of access, including water and sewage facilities, to the Tether properties remaining in the owner after the taking, the taking was almost the equivalent of a fee. But both the above and the fact that this land was later sold, subject to the takings, for recreation purposes to the Packanack community, shows that it had a residual value after the taking, fixed by the Court at $100 per acre, of $300.

While this cost the owner its best residential property abutting on the paper street, the fact that the owner could thereafter if he so desired, use a portion of this land for such a street, and give full access and facilities to his remaining lands, indicates that the severance damages to the remaining property is small indeed, fixed by the Court at $100. The net loss to Tether from the taking of this tract is, therefore, $2,200.

The final Tether tract taken is A 101E–3, of 5/10ths of an acre, a triangular piece of low ground east of A 101E–2. This taking consisted only of a line of sight easement. Because of the lowness of the ground, its intrinsic value is less than that of A 101E–2, and the evidence indicates that the line of sight easement would not interfere with the normal use of the property, either for residential or farming purposes. Thus, no matter how the loss to the above owner is looked at, this loss cannot exceed $50, and is so fixed by the Court.

### Acker, Kaminski, Saniewski

The remaining takings may be briefly disposed of. As to Tract 163E, residence premises owned by Henry R. Acker and wife, the Government took only a line of sight easement. This is, of course, a cloud on title and affects the title theoretically. Practically, however, the easement does not here interfere with the normal residence and the property, shortly after the taking, sold, subject to the easements, at an increased price. In the absence of any evidence presented by the owners, the Court finds the testimony of the expert, Schwartz, correct, that the taking caused a loss of $300.

At the same time the Government took a similar line of sight easement over Tract 164E owned by Peter Kaminski and wife. This taking required nothing more than the topping of one of the several trees in Kaminski's back yard, as compared with the topping of several of the trees in Acker's front and side yards. Bearing in mind this cloud on title, it would seem that the Kaminski taking similarly caused a loss of $150.

Finally, on March 14, 1957, the Government took three slivers of land from Stanley Saniewski and wife—Tracts A 104E-1, A 104E-2, and A 104E-3. These were only of safety areas as to the first two, and the right to run a water line as to the last. None of them in any wise interferes with the general use of the land by the owners and, in fact, these very owners had executed an option to sell these easements to the Government for $265. But they neither executed the deed, nor appeared at the hearing to object to the taking at their agreed price. Under the testimony, the agreed price of $265 is determined by the Court to be the fair loss to the owners.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by Fed.Rules Civ.Proc. rule 52, 28 U.S.C.

Judgment may be entered accordingly.